CURRAULT, Judge.
This appeal originates in the Twenty-Fourth Judicial District Court, Parish of Jefferson, Division “I”, wherein the Honorable Wallace C. LeBrun rendered judgment in favor of plaintiff-worker and against defendant-employer, finding plaintiff to be totally and permanently disabled under the odd-lot doctrine, thus awarding her 66⅜ percent of her average weekly wages at the time of injury. Defendant appeals; we affirm.
Lauranette Macon became employed as an assembly line worker with Hunt-Wesson Foods at their Gretna, Louisiana plant in August, 1978. On November 17, 1980, during her shift, Ms. Macon fell down a flight of stairs at the plant. She was seen in the emergency room at West Jefferson Hospital where she was ordered bed rest and heat treatment and was referred to Dr. Charles Anastasio. X-rays demonstrated no fracture, destruction or vertebral compression and the impression was a normal lumbosacral spine.
Dr. Anastasio, an orthopedic surgeon, initially saw Ms. Macon on November 20, 1980. After a complete physical examination, Dr. Anastasio’s impression was lum-bosacral strain, noting a complete absence of any positive indications that would indicate a disc injury to the lower back. Following a conservative approach, he placed Ms. Macon on physical therapy treatments.
Ms. Macon continued to see Dr. Anasta-sio and participated in physical therapy, but *794 continued to complain of lower back pain. As he could not find evidence of a disc problem, Dr. Anastasio felt another opinion was in order and referred Ms. Macon to Dr. Carl Culiccia, a neurosurgeon.
Dr. Culiccia then saw Ms. Macon on January 2, 1981. After a complete examination, Dr. Culiccia concluded: “On the basis of the data, it is concluded that at this time there is no neurological injury, disease or primary neurologic disorder to account for the patient’s symptoms. It is suggested that she return to full activity.” Dr. Anas-tasio received a copy of Dr. Culiccia’s consultation report and then saw Ms. Macon for the last time on January 26, 1981. Dr. Anastasio discharged her on this final visit with only the recommendation that she continue her home exercise program and resume all normal activities without restrictions.
Subsequent to being discharged by Dr. Anastasio, Ms. Macon continued her complaints of pain. In February, 1981, General Adjustment Bureau, the adjuster for the worker’s compensation claim, requested of Ms. Macon that she submit to a thermo-gram test and additional medical evaluation.
On February 11, 1981, a thermogram of the cervical spine, lumbar spine and lower extremities was conducted on Ms. Macon and the results of that test were interpreted by Dr. Masako Wakabayashi, a board certified radiologist. Dr. Wakabayashi’s impression was that there was some objective evidence of localized muscle spasms.
The thermogram was followed with a medical evaluation by Dr. George R. Cary. After a thorough examination, Dr. Cary concluded Ms. Macon “had sustained a strain to the posterior cervical musculature and lumbar musculature and ligamentous structure which remains sore to date. There are no objective findings remaining in the cervical or lumbar area on either physical examination or on X-ray examination. There was no X-ray evidence of disease or injury.... On the basis of these findings, it is felt that the patient’s soreness in the neck and low back area will resolve uneventfully without residual disability and that she may return to her normal and customary work routine. Her return to work may in fact aid in the patient’s eventual rehabilitation.”
Ms. Macon was next seen by Dr. Salva-dore Henry LaRocca, an orthopedic surgeon, who initially saw her on August 31, 1981. After a complete and thorough examination, Dr. LaRocca found no objective findings other than muscle spasms. Because of the length of time Ms. Macon complained of pain and the lack of an explanation for that pain, Dr. LaRocca decided to hospitalize Ms. Macon in an attempt to study her neck and back to find the cause of her pain. She was hospitalized at Touro Infirmary from November 6, 1981 through November 15, 1981. During this initial hospitalization, a battery of tests were performed. These studies included a myelogram of both the neck and back, an E.M.G. study and diskography of her lower back. All testing was negative and showed no abnormalities. As a result of this testing, Dr. LaRocca did not believe there was any indication for a surgical approach to her problem and further believed that she should undergo additional conservative management, primarily with anti-inflammatory medication and activity restrictions.
Ms. Macon followed the initial hospitalization with an office visit to Dr. LaRocca on November 23, 1981. Dr. LaRocca’s notes, taken during this office visit, inaccurately indicated Ms. Macon’s diskogram was positive. Dr. LaRocca made plans to perform surgery and Ms. Macon was rehos-pitalized on January 5, 1982. Upon reviewing all previous test results, Dr. LaRocca realized there were no abnormalities in the diskography or the myelography. However, there was one test available that had not previously been done and that was the epidural venogram.
Dr. LaRocca felt the epidural venogram, although not a common test, might shed further light on Ms. Macon’s problem because nothing-else had. However, the results of this test were normal and the deci *795 sion not to go forward with the surgery was made.
From January, 1982, through September, 1982, Ms. Macon was seen by various physicians associated with Dr. LaRocca. During this time she was continued on conservative management. Finally the decision was made to again hospitalize Ms. Macon as Dr. LaRocca noted, “... in light of her continued intractable problem, and failure of medical management, further hospital evaluation would be in order.” Dr. La-Rocca’s thinking was that, “perhaps sufficient time had passed that restudying her back would uncover something to help explain the problem.”
Ms. Macon was hospitalized for the third time on October 4, 1982, and was again subjected to rigorous testing. During this testing, however, the diskogram was positive showing distinct abnormalities at L-5, S-l and this could be associated with the recurrence of her back pain. On October 7, 1982, Ms. Macon underwent a laminotomy and spinal fusion.
Because early reports indicated Ms. Macon had only minor strains and that she could return to work, Hunt-Wesson discontinued her worker’s compensation payments in January, 1981. On November 5, 1981, one year prior to her surgeries, Ms. Macon filed suit alleging she was totally and permanently disabled. This matter was tried on April 23, 1984, and judgment was rendered in her favor finding her to be totally and permanently disabled and entitled to receive 66⅜ percent of her average weekly wage at the time of the accident. Hunt-Wesson now appeals, asserting that the trial court erred in applying the odd-lot doctrine to Ms. Macon’s claim finding her totally and permanently disabled. The only question for resolution, then, is whether or not the trial court was clearly wrong (manifestly erroneous) in concluding appellee was totally and permanently disabled finding her to be an odd-lot worker.
In order to qualify for compensation benefits under the odd-lot doctrine, a claimant must also prove that because of his physical impairment and other factors, such as mental capacity, education and training, he can perform no services other than those which are so limited in quality or dependability that a reasonably stable market for them does not exist. Ballard v. Younger Transportation, Inc., 461 So.2d 593 (La.App. 1st Cir.1984). See also, Holland v. T.G. & Y. Stores, 451 So.2d 1317 (La.App. 1st Cir.1984).
Dr. LaRocca, appellee’s treating physician, testified that appellee’s herniated disc, surgeries and resultant disability were directly related to her fall at appellant’s plant. Following surgery, Dr. La-Rocca assessed appellee’s physical limitations and residual disabilities as follows: she should avoid activities which would provoke pain including lifting, carrying, pushing and pulling, as well as any prolonged sitting or standing. Dr. LaRocca stated appellee should have the option to change her positions, back and forth from sitting and standing, as needed. He further stated appellee’s activities, such as carrying, lifting, pushing and pulling, should be limited to twenty-five pounds maximum. Dr. LaRocca testified that any overhead work could be a problem for appellee and absolutely proscribed her from returning to any physical labor.
Dr. Razza, an associate of Dr. LaRocca, followed appellee since her surgery and testified by deposition. As to appellee’s employability, Dr. Razza stated:
“A: Well, it depends on the hours and the leniency (emphasis added) of the employer. In other words, it would not be wise for her to attempt standing in one position much more than an hour and a half, two hours at a time without being able to change positions or to assume a seated position for a while. Inasmuch as it would involve any repetitive bending or stooping or squatting, that would not be medically advisable. But if it — if there was some leniency in employment, I mean there’s no absolute contraindication to standing for a short period of time, alternating with sitting.
*796 Q (by Mr. Breedlove): Okay_ Would she tolerate a typical secretarial job?
A: I think it’s possible. Again, the latitude of the employer is an important factor there, (emphasis added) In other words, if she can be seated for a certain period of time, then get up, walk around, maybe take a break before lunch, then a break after lunch and before she leaves the office, it’s conceivable that type of employment can be undertaken. But if there is a lot of overhead filing or a lot of having to remain stationary in one seated position for like most of the morning, then again that would not be medically advisable. So it boils down to whether or not the job conforms to the restrictions, you know, we’ve indicated.”
Dr. Razza further testified that he believed appellee was restricted to any activity involving manual labor or repetitive lifting or objects greater than fifteen pounds, any repetitive squatting, stooping or bending, climbing or overhead work and no prolonged sitting or standing in excess of a period of an hour and a half to two hours.
Both Dr. LaRocca and Dr. Razza expressed concern regarding the availability of an understanding employer who would allow appellee the flexibility and leniency required in order for her to become and remain employed. From the testimony, it is clear that appellee’s disabilities and restrictions would seriously frustrate her in whatever attempts she makes to seek gainful and meaningful employment in that there is no reasonably stable market for a worker with her limitations.
The manifest error rule is applicable to review of worker’s compensation cases and the trial court’s factual findings of work-related disability will not be disturbed where there is evidence before the trier of fact which, upon the latter’s reasonable evaluation of credibility, furnishes a reasonable, factual basis for those findings unless they are shown to be clearly wrong (manifestly erroneous). Guerrero v. Tico, 436 So.2d 1237 (La.App. 5th Cir.1983); Per-rilloux v. Godchaux-Henderson Sugar Co., 436 So.2d 1325 (La.App. 5th Cir.1983) writ denied November 4, 1983. Appellant has failed to show that the trial court was manifestly erroneous in finding that appel-lee was totally and permanently disabled under the “odd-lot” doctrine.
Accordingly, we find no reason to disturb the judgment, and for the reasons expressed above, we affirm. Appellant is to pay all costs of this appeal.
AFFIRMED.